666 So.2d 341 (1995)
Beverly PHIPPS
v.
AMTRAK, et al.
No. 94 CA 1876.
Court of Appeal of Louisiana, First Circuit.
November 20, 1995.
Writ Denied February 28, 1996.
*342 Darryl J. Carimi, Metairie, for Appellee, Beverly Phipps.
Albert H. Hanemann, Jr., New Orleans, for Appellant, Nat. R.R. Passenger Corp.
Before WATKINS, GONZALES, PARRO, FITZSIMMONS AND CRAIN, JJ.[1]
GONZALES, Judge.
This is a suit for damages for personal injury sustained by a passenger traveling in a glass-domed observation car of an Amtrak train. National Railroad Passenger Corporation d/b/a Amtrak (National Railroad) appeals the judgment of the trial court finding that the design of the observation car created an unreasonable risk of harm to the passenger. National Railroad also challenges the trial court's assessment of 70% fault to National Railroad and 30% fault to the passenger.

FACTS AND PROCEDURAL HISTORY
On August 18, 1990, Beverly Phipps, a 55-year-old resident of Jefferson Parish, Louisiana, was traveling from Chicago, Illinois, to New Orleans, Louisiana, as a coach passenger on an Amtrak "City of New Orleans" train owned by National Railroad. As the train left Hammond, Louisiana, Phipps decided to leave her seat in the coach car and go to the glass-domed observation car so that she could see the surrounding terrain through which she and her late husband had previously traveled and fished.
The design of the observation car differs from other train cars in that it contains elevated seating under a glass-domed ceiling where passengers can sit at a raised level to obtain a panoramic view of the surrounding countryside. The domed section of the car contains five rows of seats, four abreast, two on each side of a center aisle. The level of the center aisle is 13 inches lower than the level of the floor on which the seats are secured, making it necessary for a passenger to step up from the aisle to the higher level to reach his seat. Because the overall height of the observation car is necessarily restricted by the height of tunnels, bridges, and overpasses under which the train must pass, the recessed design of the center aisle is used to allow passengers to walk upright as they travel up and down the aisle under the glass-domed ceiling. The width of the recessed aisle is 18 inches.
Phipps testified that she was in the observation car for approximately one or one and one-half hours. She described her activity as "[j]ust sitting and looking." She stated, "I sat on this side for a little while and looked and then I'd cross over and I'd look out the other side." Phipps successfully stepped over the recessed aisle three or four times in order to enjoy the view from both sides of the train. However, on her fifth attempt to cross the aisle, Phipps fell into the aisle, injuring her ankle and leg.
On August 16, 1991, Phipps filed suit against Amtrak, National Railroad Passenger Corporation, and Illinois Central Railroad Company under theories of negligence and strict liability. Following a bench trial, the trial court rendered judgment in favor of Phipps against National Railroad and dismissed Phipps' claim against Illinois Central Railroad Company. The trial court awarded special damages to Phipps in the amount of $12,000.00, and then reduced the judgment to $8,400.00 based on a finding that Phipps was 30% comparatively negligent. In its reasons for judgment, the trial court stated,
The recessed aisle is an unreasonable risk of harm. The purpose of this train is transportation. This purpose can be accomplished without observation cars constructed as described in this suit. The Court's conclusions here take [into] account those principles of law discussed in Entrevia v. Hood (427 So[.]2d 1146) and Loescher v[.] Parr (32[4] So[.]2d 441).
National Railroad appeals the adverse judgment, asserting the following assignments of error:
1) The trial court erred in finding that the glass-domed observation car presented Phipps with an unreasonable risk of harm.

*343 2) The trial court erred in apportioning only 30% fault to Phipps.
Because we find that the glass-domed observation car did not present an unreasonable risk of harm, we reverse the judgment of the trial court and need not address the apportionment of fault issue.

STRICT LIABILITY
In an action asserting strict liability as grounds for recovery, the plaintiff bears the burden of proving: (1) the thing which caused damages was in the care, custody, and control of the defendant; (2) the thing had a vice or defect which created an unreasonable risk of harm; and (3) the injuries sustained were caused by the defect. Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106, 1112 (La.1990). These general principles are contained in La.C.C. art. 2317, which states, in part: "We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of the things which we have in our custody...."
In this case, the first element, custody of the glass-domed observation car, is clearly met. It is undisputed that National Railroad owned the "City of New Orleans" train, including the observation car. Thus, the next inquiry requires a determination of whether the observation car contained a defect which presented an unreasonable risk of harm under the circumstances of this case.
The unreasonable risk of harm criterion involves a myriad of considerations and cannot be applied mechanically. Oster v. Department of Transportation and Development, 582 So.2d 1285, 1288 (La.1991); Entrevia v. Hood, 427 So.2d 1146, 1149 (La.1983). This criterion is a concept employed to symbolize the judicial process of deciding which risks are encompassed by the codal obligations contained in La.C.C. arts. 2317-2322 from the standpoint of justice and social utility. Sistler v. Liberty Mutual Insurance Company, 558 So.2d at 1112-1113. The unreasonable risk of harm criterion requires the court to balance the likelihood and magnitude of harm against the utility of the thing, as well as a broad range of social, economic, and moral factors, including the cost to the defendant of avoiding the risk and the social utility of the plaintiff's conduct at the time of the accident. The court must carefully consider all the circumstances surrounding the particular accident under review to determine whether allowing recovery to the particular plaintiff involved, for damages occurring in the particular manner in which the plaintiff was injured, is desirable from the standpoint of justice and the social utility of the conduct of the respective parties. Oster v. Department of Transportation and Development, 582 So.2d at 1289.
The degree to which a danger may be observed by a potential victim is one factor considered in the determination of whether a condition is unreasonably dangerous. Wallace v. Slidell Memorial Hospital, 509 So.2d 69, 72 (La.App. 1st Cir.1987). When a dangerous condition is patently obvious and easily avoidable, it can hardly be considered to present a condition creating an unreasonable risk of harm. Rasmussen v. State Farm Fire & Casualty Company, 509 So.2d 712, 713 (La.App. 3d Cir.), writ denied, 512 So.2d 441 (La.1987).

STANDARD OF REVIEW
In determining whether the trial court correctly decided the unreasonable risk of harm issue, it is necessary to identify the proper standard of appellate review. The manifest error standard of review shields the factual findings of the trier of fact. Lewis v. State, Department of Transportation and Development, 94-2370 (La. 4/21/95), 654 So.2d 311, 314; Stobart v. State, Department of Transportation and Development, 617 So.2d 880, 882-883 (La.1993). Application of the manifest error standard creates no real problem provided the application is limited strictly to facts. For example, in the instant case, due deference should be given to the trial court's findings regarding the physical configuration of the observation car, whether the design of the car was the cause-in-fact of Phipps' injuries, how Phipps injured herself, and the extent of her injuries. However, when all the findings of fact are made, and the trial court is given the benefit of the *344 manifest error rule as to those findings, the application of those facts to the final, legal determination of whether the design of the observation car created an unreasonable risk of harm to this plaintiff is not protected on review by the manifest error rule. See Green v. City of Thibodaux, 94-1000 (La. App. 1st Cir. 10/6/95), p. 7-8, ___ So.2d ___ [1995 WL 588296]. Rather, the unreasonable risk of harm criterion ultimately presents a question of law in which the "judge is called upon to decide questions of social utility that require him to consider the particular case in terms of moral, social, and economic considerations, in the same way that the legislator finds the standards or patterns of utility and morals in the life of the community." Sanders v. Posi-Seal International, 93-1007 (La. App. 1st Cir. 4/8/94), 635 So.2d 760, 762 quoting Entrevia v. Hood, 427 So.2d at 1149-1150.
Because the decision as to whether a thing creates an unreasonable risk of harm is a legal question, this court owes no deference to the legal conclusions of the trial court. Appellate review regarding questions of law is simply review of whether the trial court was legally correct or legally incorrect. Medline Industries, Inc. v. All-Med Supply & Equipment, 94-1504 (La.App. 1st Cir. 4/7/95), 653 So.2d 830, 832.

APPLICATION OF LEGAL PRINCIPLES
In the instant case, review of all of the circumstances surrounding Phipps' accident demonstrates that the design of the observation car, including the recessed aisle, did not present an unreasonable risk of harm to Phipps. Phipps testified that she went into the observation car at approximately 1:00 p.m. or 1:30 p.m. on the day of the accident. She admitted that there was ample light in the area where she was sitting and remembered walking down the recessed aisle and stepping up to get to a seat near the middle of the car. She testified that she crossed over the aisle three or four times before the accident occurred and had no trouble negotiating the step across. In explaining how she fell, Phipps testified, "Well, I went to go from one side to the other, and when I put my foot down the floor wasn't there, so, my foot went all the way down and that's when I twisted one ankle and hit my shin on the side of the other, where the other seats were." When asked if she thought about the aisle during the time she was in the observation car, Phipps answered negatively and indicated that she spent the time reminiscing about "good times past" she had spent with her deceased husband.
As earlier stated, the degree to which a danger may be observed by a potential victim is a factor to be considered in determining whether a condition is unreasonably dangerous. Even though a "reasonable man" is permitted an occasional lapse of memory, the critical inquiry is whether or not he was exercising ordinary care for his own safety at the time of the accident and whether or not it was reasonable to forget the presence of the condition at issue. Soileau v. South Central Bell Telephone Company, 406 So.2d 182, 184 (La.1981).
The record indicates that Phipps was clearly aware of the design of the observation car and that crossing from one side of the car to the other required a step across the recessed aisle down which she had walked to reach the middle of the car. Any danger involved in negotiating the step across the aisle was patently obvious and easily avoidable. This finding is supported by the fact that Phipps crossed the aisle with no problem at least three times within the hour before the accident. Had Phipps been seated on one side of the car for over an hour without moving, it may have been reasonable that she forgot the existence of the recessed aisle as she attempted to move, for the first time, from one side of the train to the other. However, in light of the fact that Phipps successfully crossed the aisle multiple times within a short time span before the accident, we find that a reasonable person, exercising ordinary care, would not have forgotten in such a short time that a step across the recessed aisle was necessary to get from one side of the train to the other.
We also note in our assessment of the unreasonable risk of harm criterion that the glass-domed observation car has utility. Although we agree with the trial court's finding that the purpose of the Amtrak train is transportation, this does not negate the social *345 utility of the observation car. It is common knowledge that persons who choose to travel by train have a greater opportunity to view and enjoy the scenery of the regions through which the train travels than do those persons who choose to travel by various other modes of transportation. The existence of a train car which allows passengers to obtain an unobstructed, panoramic view of the surrounding landscape enhances this unique advantage of train travel. Phipps' testimony illustrates that she herself experienced the utilitarian function of the observation car.
On the other side of the balance, we note that the design of the observation car naturally diverted the attention of Phipps away from the existence of the recessed aisle and toward the passing landscape. According to J.D. Roberts, a board certified safety professional who examined the Amtrak observation car and whose report is in the record, the "uneven floor surface in the area where passengers are invited to utilize the observation car ... and where their attention is intentionally diverted in a panoramic manner to the scenery outside the train" constituted an unreasonably dangerous condition. Roberts opined that "properly color-coded and applicable `DANGER' warning signs along with ANSI approved color delineation markings on the edge of the crevice would have served to warn the otherwise distracted fare-paying passengers of this danger."
It is possible that some type of warning sign may have aided Phipps in remembering to look down as she crossed over the recessed aisle. However, it is equally possible that the existence of a warning sign would not have prevented the accident at all. If Phipps was able to remember, without the aid of a warning, that she had to step over the aisle on the first three or four times she crossed, it is questionable whether a warning sign would have made any difference on her fourth or fifth attempt to cross the aisle. The existence of a warning has significantly less relevance since it is undisputed that Phipps had actual knowledge of the risk posed by the recessed aisle.
After careful consideration of all circumstances surrounding Phipps' accident, we find that the likelihood and magnitude of the harm posed by the design of the observation car were small in light of the social utility of the observation car combined with the knowledge possessed and the conduct exhibited by Phipps immediately before and at the time of the accident. Considering the obvious nature of any danger posed by the design of the observation car, it can hardly be said that this condition created an unreasonable risk of harm to Phipps. The trial court committed legal error in finding otherwise.

DECREE
For reasons stated herein, we REVERSE the judgment of the trial court and dismiss Phipps' claim against National Railroad Passenger Corporation d/b/a Amtrak. Costs of this appeal are assessed to Phipps.
NOTES
[1] Honorable Hillary J. Crain, retired, is serving as judge pro tempore by appointment of the Louisiana Supreme Court.